## Fidelity & Casualty Company of New York v. Jacob N. Gibson.

### Gen. No. 13,351.

1. EMPLOYER AND EMPLOYE—*power of former to discharge.* An employer has a lawful right to discharge an employe with or without ᴄause, for any reason, however capricious and unfounded it might be.

2. DISCHARGE—*right of action for maliciously obtaining.* An employe whose discharge has been brought about through the malicious connivance of a third party has a right of action against such third party, and in this action both compensatory and exemplary damages may be awarded.

3. EXEMPLARY DAMAGES—*when may be awarded.* Exemplary damages may be recovered in all actions when malice is an ingredient.

4. EXEMPLARY DAMAGES—*when court will not disturb.* A reviewing court will not disturb an award of exemplary damages unless convinced that the award is so excessive as to be the offspring of prejudice, passion or undue influence.

5. VERDICT—*when not excessive.* A verdict of $1,200 in an action for maliciously obtaining the discharge of the plaintiff is held not excessive notwithstanding it was conceded that the sum awarded was in excess of the actual damages sustained, the exemplary damages awarded being held, in the opinion of the court, not so excessive as to indicate that they were the offspring of passion, prejudice or other undue influence.

Trespass on the case. Appeal from the Circuit Court of Cook county; the Hon. LINUS C. RUTH, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed July 1, 1907.

**Statement by the Court.** Appellee, a machinist, was employed by the Union Drop Forge Company as a "die maker." The forge company partially covered its liability for accidents to its employes by insuring in the appellant company. On August 26, 1897, appellee, while in the employ of the forge company, suffered while at his work an injury to one of his eyes. The effect of this injury was to incapacitate him from working for about thirteen weeks, at the end of which

time he returned to his employment.    In August, 1899, nearly two years after the injury to his eye, appellee commenced suit against the forge company for damages sustained, as he claimed, from the injury to his eye, which he charged resulted through the fault and negligence of his employer.    How is immaterial here. This liability, if any, was covered, to the extent of one-half, by policies of appellant, and in pursuance of the terms of its contract of insurance it appeared for the forge company by its attorney to defend.

On October 21, 1899, appellee was discharged from his employment by the forge company after an uninterrupted service of twelve years, except during the time he was disabled through the injury to his eye.    His discharge, it is claimed, was brought about by and at the instance of appellant, because appellee refused either to settle or dismiss his pending suit for damages against the forge company, appellant being liable to indemnify the forge company to the extent of one-half the damages, if any, ultimately recovered.

The first count of the declaration charges "that the said defendant on or about October 21, 1899, through its servants, agents and employes, maliciously, wrongfully and without any reason or lawful cause, and for the purpose of injuring the plaintiff, demanded of and from the Union Drop Forge Company that they immediately discharge the plaintiff from such employment, as such servant, thereby then and there maliciously, wrongfully and for the purpose of injuring plaintiff, procured his discharge from such employment."

In the second count, after reciting appellee's employment with the forge company, his rate of wage, the continuity of such employment and the satisfaction of his employers with his services, it is alleged that appellant, "well knowing the premises, but contriving and wrongfully and maliciously intending to injure and destroy the good name and reputation of the plaintiff as a skilled workman at his trade, maliciously and wrongfully, and for the purpose of injuring the plaintiff,

ordered, commanded and requested the said Union Drop Forge Company to discharge the said plaintiff from his said employment; and the said Union Drop Forge Company, acting under the orders, commands and requests of said defendant, on to-wit, the 21st day of October, A. D. 1899, discharged said plaintiff from his said employment; that the plaintiff, by reason of said discharge from said employment as aforesaid, remained out of employment, without any fault on his part, from the date of said discharge until, to-wit, the sixth day of December, A. D. 1899.

"Plaintiff further avers that by reason of such discharge procured as aforesaid, the plaintiff was unable to secure employment at his trade within the State of Illinois, and was compelled to seek employment without the State of Illinois."

The *ad damnum* is laid at $3,000.

Appellant at first interposed a demurrer to part of the declaration, which being overruled it pleaded the general issue to the whole declaration. A trial before the court and jury culminated in a judgment against appellant for $1,200, in an endeavor to reverse which this appeal is prosecuted and the record is before us for review.

O. W. DYNES, for appellant.

F. H. TRUDE and J. K. McMAHON, for appellee.

MR. JUSTICE HOLDOM delivered the opinion of the court.

It is urged in argument and assigned for error that the verdict is contrary to the weight of the evidence and wholly unsupported by it; improper and prejudicial remarks of counsel for appellee to and in the hearing of the jury; that the trial judge should have directed a verdict for appellant, and finally that the damages are excessive.

Did the letters which passed between appellant and

the forge company, found in the record, upon the subject of appellee's discharge, constitute all the proof on that subject, or were they substantiated by other proofs or by facts and circumstances developed by the evidence at the trial, then appellant would have been entitled to a directed verdict in its favor. But we are convinced from the evidence and the attitude of appellant developed by the record that the letters were insincere, self-serving and contradictory of the actual part which appellant in fact took in bringing about the discharge of appellee. They were thin masks invented for the sole purpose of concealing the real actions of appellant and the purposes intended and ultimately successfully brought about. The letters were subterfuges resorted to for the purpose of concealing the course pursued by appellant in demanding and successfully bringing about the discharge of appellee by his then employer. Their purpose was so apparent and the pretense so transparent that neither the jury nor the trial judge was deceived by them, and they are equally impotent to influence this court in the way intended, or to divert our attention from the real to the pretended facts.

Appellee was secure in his employment, notwithstanding his suit against his employer, until the representative of appellant, Post, came upon the scene and appellee was called into the office of the forge company and confronted with Post and Mr. Holbrook of the forge company. Post wanted appellee to make a statement of his case, which he declined to do, and referred Post to his lawyer of record in the court where the action was pending. Post then asked appellee to make a statement of the case without the advice of his lawyer; this he also refused to do. The action of appellee in refusing to accede to Post's desires was but the exercise of ordinary prudence on his part. He was a "die maker," not a lawyer, and as to his legal rights, if any he had, he naturally and properly depended upon the advice of his lawyer to

guide him. At the conclusion of this interview Mr. Holbrook said to appellee, "That will be all; you can go back to your work." On October 21 following that interview he was discharged. (R. p. 17.)

Mr. Holbrook, a witness for appellant, said on cross-examination (R. p. 81): "Up to the 21st day of October we had no fault to find with his—appellee's—work. We had no personal controversy with Mr. Gibson. Nothing in the way of his work caused us to discharge him. He was a good employe—a good man." This was the character given appellee after twelve years' service.

Notwithstanding there was no cause for appellee's discharge, yet the employer still had the lawful right to discharge him with or without cause, for any reason, however capricious and unfounded it might be. So far as appellant is here involved, what does the record disclose, if anything, it had to do with bringing about the discharge of appellee, and if it did cause such discharge, what were its motives?

It seems appellee was a member of a "labor union." The Union interested itself in the matter, and appellee went with a committee from the Union, consisting of Messrs. Brown, Melican and Worth, to call on Mr. Post in an endeavor to have him consent to the reinstatement of appellee in his employment with the forge company. All parties agree that the talk was extended, at times animated and somewhat heated. Appellee testifies that Brown was the first spokesman, and after all had been ushered by a page into the private office of Post, said, "Are you the general manager?" and Post answered, "I am the general manager of The Fidelity & Casualty Company. What can I do for you?" Whereupon Brown said, "I came here in reference to Mr. Gibson, one of our members. You had him discharged from the Union Drop Forge Company." Post then said, "Oh, yes, we had him discharged. We did not intend to let him work to earn money to fight us with." Melican of the com-

mittee then spoke to Post, saying, "Well, we came to ask you to reinstate this man." Post said, "Oh, that man has a claim against The Union Drop Forge Company. I had him discharged. We do not intend to let him work to earn money to fight us with." Then Brown told Post that Mr. Holbrook was willing that Gibson should return to work if he, Post, would consent. Post then said, "You tell Holbrook to write me. I don't intend to let him earn money to fight us with," and that he further remarked that Gibson would not get work at any other place where appellant carried insurance if he could prevent it; that the claim was very unjust in his opinion.

Melican swears that Post said he had appellee discharged and he did not propose to have him go back to work there again, and would not allow him to work anywhere else if he could help it. Melican then said to Post, "You won't allow a man to earn a livelihood?" and Post replied, "No, I don't propose to allow a man to make a dollar that he can use in fighting a suit against the company." (R. pp. 43 and 44.)

William Worth substantially corroborates appellee's and Melican's testimony as to what Post said at the meeting referred to, and Brown, the other man present, could not be found.

Mr. Holbrook, who testified for appellant, in his examination in chief said a conference was had with appellant, represented by Post, touching the advisability of keeping appellee employed, paying him wages and furnishing him with ammunition to fight with, and finally decided to let him go. (R. p. 66.)

Post in his direct examination testified that he directed an adjuster to call upon Mr. Holbrook and explain to him that it was appellant's opinion that where a suit was brought by an employe after waiting until the Statute of Limitations had nearly run, and without, in so far as could be seen, any merit, it did not seem such employe should be longer retained by the employer; that the investigator should explain to

Mr. Holbrook that if they chose to discharge Gibson it would be entirely satisfactory to appellant, and that a discharge would not prejudice the defense of the suit. Post admits that he told the "Union Labor" committee that he thought appellee's suit against the forge company was very unjustly brought, and that it did not seem to him that such a *persecution* in the courts should be countenanced.

Nelson, the investigator of appellant,. in his testimony for his employer says Post told the "Union Labor" committee that it looked rather queer to the other employes to have a man working for the company he was suing. It looked to the other employes that they could bring suit and still be retained and hold their positions.

We are unable to solve this evidence in favor of appellant's contention that the discharge of appellee was the voluntary action of his employer. Mr. Holbrook never thought of discharging him until the interview with Post had taken place in which appellee had refused either to discuss or settle his personal injury suit without the advice of his attorney. From that interview he was sent back to his work by Mr. Holbrook and subsequently peremptorily discharged, no cause being assigned. Post's frame of mind and opinion upon the ethics of the situation are clearly developed by his own evidence. He did not believe in giving a plaintiff in a suit in which appellant was involved an opportunity to earn money to fight it with. He believed firmly in the discharge of such a person. He believed appellee's suit unjust, and he testified that such a *"persecution"* in the courts should not be countenanced. That appellee's discharge would be satisfactory to appellant and would not prejudice the defense.

Nelson, an investigator for appellant, says Post told the "Union Labor" committee that it looked queer to have a man working for a company who had a

suit pending against it; that it was a bad example to set the rest of the workmen.

The overwhelming preponderance of the proof is to the effect that Post not only admitted that he had caused appellee's discharge, but threatened that he would prevent, as far as he could, his getting other employment. The purpose of the action of appellant by its manager, Post, was malevolent and malicious, prompted in an endeavor to secure an unlawful advantage over appellee in his personal injury suit, which if successful in recovering damages, the burden of paying one-half would fall upon appellant. Thus the motive for the unlawful conduct of appellant is clear. Its purpose was to injure appellee and in doing so to obtain an unworthy advantage to itself. But for the unlawful interference of appellant, appellee might, and undoubtedly would, have continued in the employment of the forge company indefinitely. Mr. Holbrook expressly stated that there was no complaint about his work; that he was a good employe and a good man, and although Holbrook does not in so many words say that the discharge was at the instance of Post, in effect that is what his testimony on this point amounts to, having in view all the evidence and the facts and circumstances in proof. Appellee's labor was his property, and in unlawfully interfering with that right of property appellant was liable to respond in damages. Malice is clearly inferable from the facts proven. The injurious, wrongful interference was evidently intentional, without just cause, and in violation of appellee's rights. The attempt to defend such illegal conduct on the assertion that the suit of appellee was unjust, is futile. That appellee was injured while in the employ of the forge company is not in dispute. Whether he had a cause of action for damages against his employer was a question of law, to test which the courts were open to him. Having counsel, he must, at least until the contrary is made to appear, be presumed to have acted upon their advice. The fact that

upon a trial the judge directed a verdict against him, is far from being conclusive that his claim was unjust. It may yet be demonstrated that it has legal merit, but if it should not, he is still the unfortunate victim of an injury received while industriously working for his employer, and if there be no right of recovery he is the more unfortunate, but not necessarily an unjust man, who should be thwarted in an honest endeavor to earn a livelihood in a reputable calling.

The right of property is protected alike by the national and state constitutions, and affirmed in numerous decisions of the courts of the country. The principle is fully discussed in: Ritchie v. The People, 155 Ill. 105; Braceville Coal Co. v. The People 147 *ibid.* 71; Doremus v. Hennessy, 176 *ibid.* 614; Franklin Union v. The People, 220 *ibid.* 370.

And as truthfully said in Leep v. S. S. C., etc., 58 Ark. 407, and adopted in Ritchie v. People, *supra:* "Of all the 'rights of persons,' labor is the most essential to human happiness." Appellant cannot be excused for maliciously interfering with this right of appellee.

The action of appellant in this matter falls within the condemnation of the Criminal Code, sec. 159, chap. 38, R. S.

We think this case is controlled by London Guaranty Company v. Horn, 206 Ill. 507, for many of the essential features here found are similar to those in the Horn case, *supra.* The court there say: "We therefore conclude, both upon reason and authority, that where a third party induces an employer to discharge his employe, who was working under a contract terminable at will, but under which the employment would be continued indefinitely, in accordance with the desire of the employer, except for such interference, and where the only motive moving the third party is the desire to injure the employe and to benefit himself at the expense of the employe, by compelling the latter to surrender an alleged cause of action, for the satisfaction of which, in whole or in

part, such third party is liable, and where such cause of action does not depend upon and is not connected with the continuance of such employment, a cause of action arises in favor of the employe against the third party.'' All the elements declared sufficient to warrant a cause of action are present in the case at bar, and the right to recover damages there accorded is by parity of reasoning sufficient to sustain a recovery here.

The evidence of appellee, Melican and Worth is ample to sustain the contention that appellant wrongfully and maliciously caused the discharge of appellee from his employment with the Union Drop Forge Company, and the evidence of Post, Holbrook and Nelson furnishes sufficient support to warrant the inference of malice so clearly established by appellee's proof. It is therefore apparent that the verdict is not contrary to the weight of the evidence, and that the trial court did not err in refusing to direct a verdict for appellant.

We have carefully examined the remarks of appellee's counsel, claimed to have been injuriously improper, and fail to find any remark not justly inferable from the proof, or that trespasses beyond the domain of that latitude permissible in the argument of such a case.

That the verdict is in excess of the actual damages suffered by appellee's being out of employment for a time on account of the actions of appellant in causing his discharge, is conceded. The verdict can only be sustained on the ground that appellee was entitled to recover punitive or exemplary damages. This action is grounded on the malice of appellant in causing appellee's discharge. Exemplary damages are recoverable in all actions where malice is an ingredient. The malice of appellant is apparent. It was not only so in the first instance, but it was continued. There is evidence in this record justifying the belief of the jury that in some instances the malice was repeated

in an effort by appellant to prevent appellee from obtaining other employment.

The fact being established that appellee was entitled to punitive damages, the amount to be awarded is for the jury and not for the court. Unless we are convinced that the award is so excessive that it was the offspring of prejudice, passion or undue influence, we should not disturb it. Donnelly v. Harris, 41 Ill. 130; Harrison v. Ely, 120 *ibid.* 86; Doremus v. Hennessy, 62 Ill. App. 391.

The trial court, urged thereto by appellant's counsel, erroneously, we think, admitted in evidence the record of the personal injury case in which the court directed a verdict against appellee's claim. From the judgment entered on this directed verdict the record shows an appeal was prayed and perfected to this court. The result of the trial of that case had no bearing whatever upon the trial of this. If it had, the legality of the action of the trial judge remained in doubt pending the decision on appeal. It was not even properly allowable in evidence in diminution of damages, for if it was, and the judgment had been in favor of appellee, that record might be offered by appellee in aggravation of damages—a proposition clearly untenable. What effect that improper evidence may have had upon the jury in awarding damages, we are unable to say, although we would be inclined to the opinion that it did not have the effect of minimizing them. But the error was of appellant's creation, about which it cannot now be heard to complain.

We regard the award of damages full and ample, but not excessive. What this court said in Hildreth v. Hancock, 55 Ill. App. 572, is equally applicable here: "Whatever may have been the jury's view on the subject, while from one standpoint alone we would be better satisfied with a lesser amount than that found, it would seem presumptious to set aside the conclusion of the jury in respect to a matter peculiarly within their province, with better means for a proper deter-

mination, and so largely also of discretion to be exercised with reference to these means. The judge presiding in the trial, with the same means, who was earnestly appealed to, saw nothing in the case to warrant his interference with that conclusion, and after due consideration we are unable to assign any clear and satisfactory reason for so doing."

The trial judge gave fourteen instructions to the jury at the instance of appellant, which presented very favorably to appellant's cause the law governing the controversy. No countervailing instructions were either asked or given.

The record shows that the trial was fairly conducted, that all the defenses proffered by appellant were heard, and that the trial judge committed no error prejudicial to appellant's claimed defenses, and we are of the opinion that substantial justice has been attained by the judgment of the Circuit Court, and it is therefore affirmed.

*Affirmed.*