### Illinois Steel Company v. John Brenshall.
### Gen. No. 13,821.

1. MASTER AND SERVANT—*when obedience of orders relieves servant from assumption of risk.* The doctrine of assumed risk does not operate to prevent a recovery where the servant is injured while performing an act pursuant to the order of his master, unless the danger of obeying was so imminent that a man of ordinary prudence and caution would not have incurred it.

2. MASTER AND SERVANT—*when doctrine of fellow-servants will not preclude recovery.* The fellow-servant rule will not operate to preclude a recovery where the servant is injured while obeying an order of his master, unless the danger of obeying such order was so imminent that a man of ordinary prudence and caution would not have incurred it.

3. TORTS—*when procuring discharge of employe gives cause of action.* It is actionable for one company to procure the discharge

Illinois Steel Company v. Brenshall.

of an employe of another company, pursuant to a rule existing be-tween such companies, because of the refusal of such employe to re-lease a claim for personal injuries held against the company obtain-ing such discharge.    A rule of the kind in question is unconscion-able, unjust, tyrannical and unlawful and subject to the severest condemnation.

4.  INSTRUCTIONS—*when complaint as to, given in Municipal Court, will not reverse.*  Complaints of instructions given in a trial had in the Municipal Court even though well taken will not afford ground for reversal unless the Appellate Court is satisfied that the judgment "was contrary to the law and the evidence."

Action in case for personal injuries.  Error to the Municipal Court of Chicago; the Hon. ARNOLD HEAP, Judge, presiding.  Heard in this court at the October term, 1907.  Affirmed.  Opinion filed April 30, 1908.  Rehearing denied May 14, 1908.

**Statement by the Court.**  The defendant in error, plaintiff below, recovered judgment against the plaint-iff in error, defendant below, for the sum of $615.50 and costs, which judgment is sought to be reversed by this writ of error.  The plaintiff's bill of particulars is as follows:

"Plaintiff's claim is for an injury to his person caused by being burned by molten iron on or about May 21, 1906, while removing covers from molds con-taining molten iron while at work in the defendant's plant at South Chicago, Illinois; said injury was occa-sioned by defendant's negligence and misconduct.  And for the wrongfully and maliciously procuring the dis-charge of the plaintiff from the employment of the Chi-cago, Lake Shore & Eastern Railroad Company, on or about the twelfth of December, 1906, and for prevent-ing him from getting similar employment elsewhere in South Chicago."

The cause was tried by the court and a jury, and the jury rendered a verdict, finding the defendant guilty as to the charge of negligence, and assessing the plaintiff's damages at the sum of $100, and also found the defendant guilty of unlawful interference with plaintiff's contract of employment, and assessed

his damages at $517.50, and the court, after overruling defendant's motion for a new trial, rendered judgment on the verdict.

KNAPP, HAYNIE & CAMPBELL and WILLIAM BEYE, for plaintiff in error.

GRAHAM & ROWAN, for defendant in error.

MR. JUSTICE ADAMS delivered the opinion of the court.

We will first consider the charge of negligence. The plaintiff, John Brenshall, had worked for the defendant, the Illinois Steel Co., about ten years at the time of the accident. May 21, 1906, he had been working on the pouring platform at defendant's plant about three weeks. The pouring platform was what the men stood on to pour molten metal into the molds, which metal was brought to the platform from the furnaces in ladles and in a molten state. The ladles were moved by a crane. The building lengthwise was north and south, and the platform was at the west side of the building and also ran north and south. Just east of and parallel with the platform there was a narrow guage railway track, and the cars which were operated on the track had cast iron tops, on which the molds rested, and each car could carry three molds. The molds were twenty-five inches in diameter and six feet high, and when brought alongside the pouring platform on a car were about two feet higher than the platform, the latter being about seven feet high. A ladleful of molten metal is called a heat, and fifteen or eighteen molds are poured from a ladle, the ladle being moved along the line of molds as the pouring proceeds. After each mold is filled it is capped, by fitting a metal plate, called a cap, into the hole at the top of the mold. There are lugs on the side of a mold at the top, and the cap when put on is held in place by a bar passed through the lugs over the top of the cap, and driving a wedge between the

bar and the top of the cap.   After capping a mold, water is put on it to cool it.   Sometimes aluminum is put into the molten metal in the mold, which is called the heat, in order to quiet it down.   It was the duty of John Pfister, the plaintiff's immediate boss, to do this.   There was no aluminum put in the heat which was poured at the time in question.

Shortly before the accident a heat had been poured into the molds, and the molds had been capped.   During the three weeks that plaintiff had been working at the pouring platform, it was part of his duty to knock out the wedges which held the caps in place and take off the caps.   Plaintiff testified that Pfister, his foreman, told him to take the wedges off, and he said no, that there might be an explosion, to wait five or ten minutes, and Pfister said, "No, go ahead, never mind."   Plaintiff further testified, in his imperfect English, "Well, you find out of course, I had to do that; if I don't do it, he push me out.   Then I started. I heard one explode.   I run away.   It catch me right here, right here on the back and hand.   The metal struck me on the wrist of the left hand," etc.   The plaintiff used a hammer to drive out the wedges.

Pfister testified in chief that he was plaintiff's boss, and that he was not at the platform when the accident occurred, but was a minute later, and that plaintiff, before he started to knock off the wedges and bars, did not complain of the heat being hot, and that he did not tell plaintiff to go ahead and do it anyway, or anything like that.   But, on cross-examination, he was questioned and answered as follows:

"Q.   Didn't he say to you that they were too hot, that he was afraid of getting burned?   A.   No, sir, not that I know of.   I don't remember it.

Q.   You are not sure whether he did say it or not? A.   No.

Q.   Did you tell him to go on and take them off, they were all right?   A.   I don't remember."

Counsel for defendant contend that the work which

plaintiff was ordered to do was part of the ordinary routine of his work, and, therefore, he assumed the risk of doing it; also that the negligence, if any, was that of a fellow-servant. It is true that it was part of the plaintiff's ordinary work to uncap the molds; but that he assumed the risk of so doing at the time in question, is, assuming his testimony to be true, an untenable proposition. From his experience in uncapping the molds and his observation at the time of the accident, he thought the metal was too hot, and that he was in danger of being burned if he then undertook to uncap the molds. So thinking, he requested delay for five or ten minutes, but was peremptorily ordered by his foreman to proceed with the work. Being so ordered, he was not required to disobey, unless the danger of obeying was so imminent that a man of ordinary prudence and caution would not have incurred it. Ill. Steel Co. v. Schymanowski, 162 Ill. 447, 456; Offutt v. Columbian Exposition, 175 ib. 472, 479; Gundlach v. Schott, 192 ib. 509, 512. And whether plaintiff, in obeying his foreman's order, acted in a reasonably prudent and cautious manner, was a question for the jury. Ill. Steel Co. v. Schymanowski, 162 Ill. 460, and cases cited.

In Offutt v. Columbian Exposition, 175 Ill. 472, it appeared from the evidence that the plaintiff was a painter, and "thoroughly understood the hanging of ladders and the putting up of scaffolds," and that he objected to the way in which his foreman directed him to hang a scaffold, saying it was liable to come down; but his foreman told him it was all right and to fasten it up, and he, the plaintiff, testified on the trial that the way he first fastened the strap and hook was the proper, usual and customary way, and that it was safe, and that he thought that the way the foreman told him to do it was the wrong way. The scaffold fell with the plaintiff on it, and he was seriously injured. The jury found for the plaintiff and the court affirmed a judgment rendered on the verdict.

Defendant's counsel urge, in support of their second contention, that the negligence was that of plaintiff's fellow-servant, in failing to put sufficient water on the molds to cool them. This proposition cannot be sustained. The order to the plaintiff was to go ahead and uncap the molds in the condition in which they were when the order was given, and after plaintiff had protested that the molds had not cooled sufficiently.

We will next consider plaintiff's claim that the defendant wrongfully and maliciously procured his discharge from the Chicago, Lake Shore & Eastern Railway Company. After the plaintiff was injured, he went to the hospital and had his wounds dressed. He testified, in substance, that it was about a month before he could go to work, and that he then started to work for the Chicago, Lake Shore & Eastern Railway Company, and subsequently he went, by direction of his foreman, to see Mr. Young, who was safety inspector and claim agent for the defendant and also for said railway company, and Young told him that unless he would sign a release he would discharge him from the railway company. He refused to sign a release, and returned to his boss, who wanted to know what had occurred, and plaintiff told him that he had been hurt at defendant's place, and Young wanted him to settle, but did not want to pay him anything, and he would not settle. His boss then said, "All right; go ahead to work," but in about five minutes his boss received an order and said to him, "I think you better go and settle up," and, on plaintiff saying they did not want to pay him anything, his boss said he could not help him, to take up his tools, and when he started to put his tools in his tool box, his boss told him to remain during the afternoon, which he did, and then left.

Charles E. Wickliff, Jr., car foreman at the shops of the railway company, was plaintiff's foreman at said shops. He testified, in substance, that on the

morning of December 13, 1906, he received a notice, through the timekeeper in the office, that plaintiff was wanted at the safety department, and so told plaintiff, and on being informed by plaintiff that he was hurt at defendant's place, he asked him if he had signed a release, and on plaintiff's answering no, he said to him, "That is what they want you over there for, so you better go over. My advice to you is to sign a release, because I don't think I will be allowed to let you work any longer unless you do." Witness further testified, that, when plaintiff returned from the safety department, he let him go back to work; but, about noon, he received an order, through the clerk who had before notified him, that he had better let the man go, and he told plaintiff he would have to let him go, if he wouldn't sign a release, and plaintiff then left.

Robert J. Young testified substantially that he was in the employ of the Illinois Steel Company and the Chicago, Lake Shore & Eastern Railway Company as safety inspector, looking after accidents, investigating them and settling claims, and that men injured while working for either company passed through his office before returning to work, to get a clearance paper showing that they had settled all claims against the company where they were injured. Witness further testified that the railway company's shops were within the fence of the Illinois Steel Company's plant. He testified as follows in reference to a rule of both companies: "There is a rule or regulation that a man injured while working for one company, is not knowingly allowed to work for either company, within the plant of the Illinois Steel Company, until he has settled." The witness testified that the first time plaintiff came to see him, after the accident, was about the middle of June, and that plaintiff was not then given a clearance, and that the next time he saw him was in December; that he did not know that, in the meantime, plaintiff was working for the railway company,

and learned it only by plaintiff's attorneys coming to him in reference to a settlement. Witness also testified that he is the person who determines the question of the employment of men who have been injured.

John Rowan, an attorney at law, testified that he had a conversation with Mr. Young, in which he asked Mr. Young questions, and the following occurred:

"Q. Mr. Young, I see you have got Mr. John Brenshall discharged from the C., L. S. & E. A. Yes, I did." Witness said, "I don't think you ought to have done that," and Young said, "Why not? He treated us wrong?" "Q. What did he do?" "A. He asked us for money." Witness testified that Mr. Young also said, "I got him discharged from the C., L. S. & E., and I will follow him to the Baltimore & Ohio and get him discharged." This evidence is not contradicted by Young or at all.

Wickliff, plaintiff's foreman while he was working in the railway shops, corroborated Young as to the existence of the rule. Young testified that plaintiff asked $400 to settle, but plaintiff testified that he only asked $100. The evidence shows beyond question that Young, as the defendant's agent and acting in the enforcement of the rule above mentioned, procured plaintiff's discharge from the employ of the C., L. S. & E. Railway Company, because the plaintiff would not settle with defendant on its own terms. The rule in question is the expression of a combination and agreement between the two companies to force a settlement and the execution of a release by any one injured in the employ of either company, by presenting to him the alternative of discharge by the company in whose employ he was injured, and the refusal of the other company to employ him, or if, by inadvertence, it employs him, his discharge by that company. The rule is unconscionable, unjust, tyrannical and unlawful, and cannot be too severely condemned. The following language used in Fidelity & Casualty Co. of N. Y. v. Gibson, 135 Ill. App. 290, is applicable

in this case: "We think this case is controlled by London Guaranty Company v. Horn, 206 Ill. 507, for many of the essential features here found are similar to those in the Horn case, *supra*. The court there say: 'We therefore conclude, both upon reason and authority, that where a third party induces an employer to discharge his employee, who was working under a contract terminable at will, but under which the employment would be continued indefinitely, in accordance with the desire of the employer, except for such interference, and where the only motive moving the third party is the desire to injure the employee and to benefit himself at the expense of the employee, by compelling the latter to surrender an alleged cause of action, for the satisfaction of which, in whole or in part, such third party is liable, and where such cause of action does not depend upon and is not connected with the continuance of such employment, a cause of action arises in favor of the employee against the third party.' " The judgment in the case cited was affirmed by the Supreme Court in 232 Ill. 49.

See, also, as to plaintiff's right to recover, Doremus v. Hennessy, 176 Ill. 608, and cases cited *ib*. 616. Defendant's conduct in the premises was malicious. In the case last cited, the court say: "An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of another, it is malicious." Defendant's counsel offered to prove reasons for the rule, and the court excluded the evidence. The defendant's reasons for the rule are immaterial and the evidence was properly excluded. The reason for the rule, which defendant's counsel offered to prove, was that plaintiff might not have access to defendant's plant to procure evidence in respect to his injury. This was an admission that one object of the rule was the suppression of evidence.

The court instructed the jury orally, and defendant's counsel asked fourteen instructions, all of which were refused, and counsel urge numerous objections

to the rulings of the court in respect to instructions asked, and as to parts of the court's oral charge. Section 23 of the act in relation to the Municipal Court, as amended, provides: "No order or judgment sought to be reviewed, shall be reversed unless the Supreme Court or Appellate Court, as the case may be, shall be satisfied from said statement or stenographic report, or reports, signed by said judge, that such order or judgment is contrary to the law and the evidence," etc.

In this case we are not so satisfied. On the contrary, we think the judgment in accordance with the law and the evidence. We will say, however, that even if we ignore section 23, we find no error in the court's rulings on instructions which would warrant us in reversing the judgment.

Counsel for defendant suggest, rather than argue, that the damages are excessive, and that defendant should not be required to pay punitive damages. We do not think the damages excessive. The plaintiff suffered actual damage, and, as said by the court in Gibson v. Fidelity & Casualty Co., 232 Ill. 49, 53, "There is evidence in the record which, if believed by the jury, would justify exemplary damages."

The judgment will be affirmed.

*Affirmed.*