344    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

## Harry Kemp et al., Appellants, v. Division No. 241 of Amalgamated Association of Street and Electric Railway Employes of America et al., Appellees.

### Gen. No. 14,917.

1. PLEADING—*effect of demurrer to bill in chancery.* A demurrer admits all facts which are well pleaded in the bill; a general demurrer, though special in form, cannot reach mere technical defects unless they are pointed out.

2. STRIKES—*how far legal.* There is no question of the legal right of employes individually and collectively to strike and to announce to their employers their intention to strike, and their reasons therefor, where no contract rights are involved.

3. STRIKES—*when illegal.* If no trade dispute exists between employer and employe and the controversy is between the employes over a matter not connected with their employment, and a strike is inaugurated against the employer to compel or coerce him to discharge an employe unless such employe will become a member of the union, or to force the employe against his will to join the union, such strike is without right and illegal and the rights of such employe are unlawfully interfered with, and he has a right of action for all losses directly resulting from such action.

4. INJUNCTIONS—*when lie to restrain acts designed to effect discharge of complainant.* In an action by former members of a union against such union and its officers, an injunction may properly be granted restraining such defendants and their agents from plotting, planning and conspiring, wrongfully and unlawfully, to do any act or in any manner whatsoever attempt to coerce or intimidate the employer of the complainants for the purpose of procuring, bringing about or causing the discharge or dismissal of complainants as employes because of the fact of the resignations of such employes from such union, and the propriety of the injunction is not affected if it can be said that the purpose and object of the conspiracy and threats was to compel such complainants' discharge only in the event that they refused to withdraw such resignations and again join such union.

5. INJUNCTIONS—*jurisdiction to restrain conspiracy.* Chancery has jurisdiction to restrain an unlawful conspiracy because of the discharge of a number of employes, if suits at law would afford an inadequate remedy and if a multiplicity of actions would result from the failure of equity to interfere.

MACK, J., dissenting. (Dissenting opinion filed May 14, 1910. See *post*, p. 637.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

Bill for injunction.  Appeal from the Circuit Court of Cook county;
the Hon. CHARLES M. WALKER, Judge, presiding.    Heard in the
Branch Appellate Court at the October term, 1908.    Reversed and
remanded with directions.  Opinion filed March 18, 1910.

GEORGE L. TURNBULL, for appellants; CARNAHAN,
ELSDON & SLUSSER, of counsel.

KICKHAM SCANLAN, for appellees.

MR. JUSTICE SMITH delivered the opinion of the
court.

This case comes to this court on an appeal from a
decree sustaining a demurrer to appellants' amended
and supplemental bill of complaint for an injunction,
and dismissing the bill for want of equity.

The amended and supplemental bill alleges that com-
plainants are and have been for many years last past
employes of The Chicago Railways Company, a cor-
poration, and its predecessors; that after becoming
such employes they joined as members the defendant
organization, Division No. 241 of the Amalgamated
Association, etc., hereinafter designated, for conven-
ience, Division No. 241, said organization being com-
posed of certain of the employes of said Chicago Rail-
ways Company; that complainants have spent and
given up the better part of their lives in the employ-
ment of said railways company and its predecessors;
that at their age, station and condition in life, and
because of their long connection with and employment
by said street railways company, complainants are
very uncertain of their ability and the probability of
obtaining and performing other employment than that
they are at present engaged in, in the event of their
losing their present positions with said company; that
at the time of complainants becoming members of Di-
vision 241, the dues and assessments payable by the
members thereof were fixed by the by-laws thereof at
50 cents per month and 75 cents every three months to
be distributed to certain funds, as fixed by such by-
laws; that since they become members said Division

has raised its due to 75 cents per month; that from the inception and organization of said Division to the present time in the neighborhood of $190,000 has been paid into said Division in the form of dues and assessments by its members, including complainants, and that of this fund there remains at the present time only the sum of about $5,000, the balance of said fund of $190,000 having been expended by said Division in part in manner and form and for purposes objectionable to complainants, as will hereinafter be shown by complainants, and complainants more specifically represent that in the expenditure of said moneys of said organization $1,200 was wrongfully and improperly expended and diverted from the funds of said Division to and in support of furthering the question of municipal ownership of the street railways of Chicago, and, as complainants are informed and believe, in support of the Democratic mayoralty campaign, the principal issue of which was the question of municipal ownership of street railways in Chicago, and that said sum was diverted wholly regardless of and over the objection of complainants and other members of said Division, and regardless of the fact that the political opinions and affiliations of said Division were about evenly divided; that because of the facts above set forth, and because complainants did not desire to be members of an organization where the expenditures of the funds of the organization could be expended and diverted as above set forth, and because in the opinion of complainants their membership in said organization had ceased to be a benefit to them, they tendered their resignation as members of said Division 241, to take effect on February 1, A. D. 1908, and from and after that date complainants ceased to be members of said Division.

That the officers and members of the Executive Board of said Division 241 (naming them), together with their committees, agents, servants and certain other members of said Division, because of complain-

ants' resignation as members of said Division as aforesaid, wrongfully and unlawfully and without any right in the premises, planned, plotted and conspired to cause the dismissal and discharge of complainants from their respective employment for and with said Chicago Railways Company, and in furtherance of said wrongful and unlawful plan, plot and conspiracy had, or caused to be appointed, a certain committee of the members of said Division 241 for the purpose of causing the discharge and dismissal of complainants by means of coercion, intimidation and threats, and complainants represent that in furtherance of such plan, plot and conspiracy, the members of said committee, or some of them, called upon John M. Roach, an officer of said railways company, who had authority and power to discharge and dismiss complainants, and then and there demanded such discharge by said company by means of threats, coercion and intimidation, as herein set forth, giving as a reason for such discharge and dismissal and their demand, that complainants had resigned from said Division and refused to continue as members thereof and pay the dues levied and assessed by said Division, as hereinbefore set forth; and complainants further represent that in furtherance of said plan, plot and conspiracy, and for the purpose of coercing and intimidating said Roach, said committee of defendants threatened then and there that unless the demands of the committee and other parties to said plan, plot and conspiracy to have complainants discharged were complied with, and unless complainants were dismissed and discharged from the employ of said Railways Company, the members of said Division above named, together with certain other members of said Division, would combine, confederate and agree together to insist upon the discharge of complainants, and the members of said committee and the defendants hereinafter named in the furtherance of said plan and conspiracy to cause the discharge of

348    Appellate Courts of Illinois.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

complainants as aforesaid, did then and there threaten the said Roach, as the agent and officer of the said railways company, that unless the demands of said committee were complied with, they, together with all other members of said Division, would combine and confederate together and call a strike of the employes of said railways company, thereby disabling and wrecking the service of and preventing the operation of said company's business; that because of such threats of said committee and other defendants so wrongfully and unlawfully made as aforesaid, for the purpose of coercion and·intimidation and in furtherance of said plan and conspiracy, said railways company, through its officer, said Roach, did then and there agree to submit the question raised by said committee of the discharge of complainants to arbitration, without notice to or the consideration or representation of complainants' rights in the premises, and that said offer of said company to so arbitrate was then and there refused by said committee, and thereafter said committee reported back to some of the officers and members of said Division and to defendants herein named the facts and circumstances concerning said meeting with and the demands made upon said company, as herein set forth, and that thereupon, in furtherance of said plan and conspiracy to compel complainants' discharge, and for the purpose of intimidating said company, its officers and agents, the defendants herein named and certain other parties to such conspiracy, called a meeting of some of the members of said Division and passed a resolution, which complainants are informed and believe was to the effect that unless complainants were discharged from the employ of said company, which complainants allege is a public service corporation organized for the purpose of transferring the public generally to and from their places of destination upon and along the lines of said company, the officers and members of the executive board, together with the members of

said Division, should call and would call a strike as aforesaid; that thereafter, in furtherance of said plan, plot and conspiracy to wrongfully and unlawfully cause the discharge of complainants as aforesaid, and for the purpose of further coercing and intimidating said company and its officers and agents having power to discharge complainants from the service of said company, said defendants herein named, together with their servants and agents, caused to be printed and circulated certain circulars and publications, one of which was and is the official organ of said Division, which are attached hereto and made a part of this bill.

Complainants further represent, on information and belief, that in furtherance of said plot, plan and conspiracy, and for the purpose of wrongfully and unlawfully causing the discharge of complainants as aforesaid, by means of coercion and intimidation, as herein set forth, and in accordance with their threats as herein set forth, the defendants herein named caused a vote to be taken of the members of said Division on the question, ''Shall we cease to work with men who, after receiving benefits through our organization, refuse to continue members?'' and that the result of said vote on said resolution was that said resolution was carried by the affirmative; and, on information and belief, that the vote so taken was not in accordance with and as provided by the by-laws, rules and regulations of said Division, either as to the time or place when and where said vote should be taken; that said vote was taken in disregard of the by-laws, rules and regulations of said Division for the purpose of enabling the parties to the said plan, plot and conspiracy to coerce and intimidate members of said Division into voting in the affirmative of said question by enabling some of the defendants herein named and some of the parties to said conspiracy to watch members of said Division as they were in the act of voting and also for the purpose of persuading and intimidating the mem-

bers of said Division 241 who did vote, into voting in the affirmative of said question, and complainants represent that for the purposes herein set forth said vote so taken was not a secret ballot, as is provided by the laws, rules and regulations of said Division.

Further, on information and belief, that in furtherance of said plan, plot and conspiracy to cause the discharge and dismissal of complainants and since the taking of said vote and since the filing of the bill of complaint in this cause, and to further intimidate, coerce and compel the said company to discharge complainants, the said committee representing the parties to said plot, plan and conspiracy, and representing the defendants hereinafter named, have attempted to arrange a meeting with the said Roach, as an officer of said company, for the purpose of discussing the question of complainants' discharge, and to that end have attempted to communicate with the said Roach and arrange such a meeting over the telephone.

That complainants have always been and are now in good standing as employes of said railways company and that there is perfect harmony between complainants as such employes and said company; that there is no cause or reason for their discharge from their respective positions as employes of said railways company other than that contained in the demand of the aforesaid committee representing certain of the members of said Division and the other defendants hereinafter named, as hereinbefore set forth.

Further, that complainants have been solicited to withdraw their resignation from said Division by certain members thereof and that it is solely because of their refusal so to do that said plot, plan and conspiracy has been organized and instituted, and for no other reason whatsoever; that because of said wrongful and unlawful plot, plan and conspiracy and because of the threats and attempted coercion and intimidation as hereinbefore set forth by said Division, its officers

and members, and their agents and servants in that behalf, complainants fear and have every reason to believe and so do believe that the said company, by its officers and agents, will be wrongfully and unlawfully compelled, as the result of such threats, attempted coercion and intimidation, to discharge or cause to be discharged complainants from its employ, without any other reason or cause than hereinbefore set forth.

Further represents that complainants' employment with said company is the sole means of their earning and supplying the means of livelihood for themselves and families, and that the causing of their discharge or dismissal as aforesaid, and for the reasons herein set forth, will cause complainants irreparable injury; that the members, officers and executive board of said Division, and also said Division and the defendants herein named as conspiring, are unable to respond in adequate damages which will be suffered by complainants in the event of their wrongfully and unlawfully succeeding in causing their discharge.

Further represent that this action is brought for the purpose of preventing a multiplicity of suits; represents upon information and belief that unless the injunction of the court issue immediately and forthwith, as hereinafter prayed, the rights of complainants in the premises will be unduly prejudiced and forever lost.

The bill prays that said Division and its agents, attorneys, officers and servants and other persons (naming them) who are made parties defendant may be required to make full and direct answer to the same, answer under oath being waived, and that said defendants, their agents, etc., may be restrained by the order and injunction of the court until the further order of the court from plotting, planning and conspiring to wrongfully and unlawfully do any act or say anything or in any manner whatsoever attempt to coerce or intimidate said railways company by or through any of its

officers or agents, for the purpose of procuring, bringing about, or causing the discharge or dismissal of complainants as employes of said company, and from in any manner, by means of wrongfully and unlawfully combining together in concerted plan, plot, conspiracy or action to do any act or thing in any manner whatsoever for the purpose of wrongfully and unlawfully— causing or attempting to cause or bring about such discharge or dismissal by reason of the fact that complainants have resigned as and are no longer members of said Division, or from in any manner for any other unlawful or wrongful reason causing complainants' discharge as such employes; that upon hearing such injunction may be made permanent; that such order and injunction be issued forthwith and that complainants may have such other and further relief as equity may require, etc.

Prays for a writ of injunction restraining the defendants as above set forth until the further order of the court.

Attached to said bill are the following exhibits: Two articles from publication entitled "The Union Leader," official journal of the car men of Chicago, published weekly by the Amalgamated Association of Street and Electric Railway Employes of America, dated Chicago, Saturday, May 16, 1908. One of said articles is entitled: "The Man Who Receives Benefits Should Pay for Them." Said article asks the question whether a member can withdraw from The Amalgamated Association while working on a system where the organization to which he belongs exists, when his position makes him eligible to membership, and answers the question in the negative, basing such answer primarily on self-protection, holding a labor organization to be different from a fraternal organization and based much upon the principle of a standing army and also upon the principle of a republic, and stating that its inlet is voluntary, but that its outlet

is voluntary only upon the specific conditions laid down in the rules to govern and accepted by the person who becomes affiliated with it, and that as all governments are built upon protective lines to prevent encroachment from an enemy, so all labor organizations must, following the same principle, to bring the same results.

The other of said articles contains the following:

"It is well understood that a closed shop condition has obtained on this system since the decision of the arbitration board of 1902, when it was recommended that all employes of the company become and remain members of the Amalgamated Association in order to better maintain discipline and to promote the harmony necessary to successful operation.

"Since then, however, it has been necessary at intervals to call the attention of the management to the action of a few who persisted in becoming delinquent, and upon all of these occasions they have been obliged to pay up. This procedure was in line with the expressed understanding between the management and the organization.

"A new attempt to evade membership and the payment of dues was commenced last December, however, and some twenty-five men on the system followed this course. The new procedure was to resign from the organization.

"The resignation scheme was but another method of evading the payment of dues. In this way a few malcontents felt they could release themselves from the responsibilities of membership and secure all the benefits brought about by the efforts of the organization without paying anything in return to share the expense."

Sheet from "The Union Leader" containing article as follows: "Strike voting, Division 241. The strike vote taken by Division 241 commencing at 8 o'clock last Saturday morning and finished at 4 o'clock Sunday morning resulted as follows: Yes, 4,403; no, 59."

Also attached to said bill as an exhibit is the following:

354    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

"IMPORTANT.

To MEMBERS OF DIVISION 241:

FELLOW MEMBERS: The life of your organization is being threatened by the action of some who refuse to abide by their obligation to assist in its perpetuation. The Company refused to carry out its well defined and agreed policy to assist us in proper and necessary discipline.

If the present condition is permitted to continue the life of your magnificent organization is at stake. A determination upon your part to protect your interests and those dependent upon you is now necessary.

Will you permit yourself to be degraded, demoralized and cast into the conditions of the unorganized past by the actions of an unprincipled minority, supported by the passive and negative attitude of the Company?

At the regular meeting of your Division last Thursday evening it was decided unanimously that a strike vote be taken at Schoenhofen's Hall, Milwaukee and Ashland Aves., to-morrow, Saturday, May 9, from 8 o'clock Saturday morning to 4 o'clock Sunday morning.

It is up to you to protect your organization. Consider carefully and don't fail to vote.

Fraternally,

JOHN H. LARKIN, President,

C. W. MILLS, Rec. Secy.,

WM. TABER,

Fin. Secy. and Business Agent,

PATRICK McMANUS,

WM. QUINLAN,

FRED C. KRUEGER,

D. ENRIGHT,

Committee representing Div. 241,

A. A. of S. & E. R. E. of A.

Chicago, Ill., May 8, 1908."

The general and special demurrer of defendants sets out the following grounds:

1.    That the complainants have not in and by their said bill made or stated such a case as entitled them or either of them in a court of equity to any discovery

or relief from or against these defendants or either of them touching the matters contained in said bill, or any of such matters.

2.   That divers scandalous and impertinent matters are set forth and alleged in said bill wholly irrelevant to the alleged grounds upon which the complainants base their alleged right to the relief prayed for in said bill.

3.   That no facts are alleged in or set forth in said bill which would warrant a court of equity in issuing an injunction as prayed in said bill.

4.   That no facts are alleged or set forth in said bill showing that these defendants or either of them, were engaged in any unlawful conspiracy or enterprise.

5.   That it appears upon the face of said bill that the things that these defendants are charged with doing and intend doing are things that the defendants and each of them individually or collectively had a lawful and legal right to do.

6.   That said bill shows on its face that there is a non-joinder of a necessary party defendant.

7.   Said bill shows on its face that there is a non-joinder of necessary parties complainant.

The demurrer admits all facts which are well pleaded in the bill. No particular averments of facts are pointed out, either in the demurrer or in argument as not being well pleaded, or as amounting to conclusions of fact or opinions. The demurrer, though special in form, is general in character. It in effect, therefore, raises the legal question whether the facts stated in the bill entitle the complainants to relief in equity. The bill was so treated in the Circuit Court by the chancellor, if his opinion is correctly quoted in defendants' brief; and no formal or technical grounds against the averments of the bill are urged in defendants' brief. We are justified, therefore, in treating the amended and supplemental bill in the same way.

It is important at the outset to understand and carry

356    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

in mind the real issue presented by the bill. If we may judge from the quoted opinion of the chancellor, and the brief of defendants filed herein, this was misapprehended by court and counsel for defendants. The question presented is not whether the defendants "have as much right to refuse to work if they see fit as the complainants have to work," or that "the injunction if issued, would have to be directed to preventing citizens from exercising rights guaranteed to them by the constitution and the laws of this state and of the United States. Or, to put it in another way, it would put this court in the unwarranted and unwarrantable position of attempting to compel men to work against their will," as stated in the opinion of the chancellor. Nor, is the bill based "solely on the ground that appellees (defendants) acting together, had not the legal right to strike, and to announce to their employer, the Chicago Railways Company, their intention of striking, if said company retained appellants (complainants) in its employ," as stated and argued by counsel for the defendants in his brief. The legal right of employes individually and collectively to strike and to announce to their employer their intention to strike, and their reasons therefor, where no contract rights are involved, and with no purpose to injure third persons, has not been questioned by courts in recent years to our knowledge. In Franklin Union v. People, 220 Ill. 355, this right was upheld. But, as stated above, this is not the question made by the facts averred, and the relief prayed in the bill.

The controversy here involved is not between an employer and employes. It is in no sense a dispute between capital and labor. It is a controversy between the employes of the same employer—a few individual workmen, complainants, on the one hand, and a large and powerful combination of workmen, defendants, on the other hand. It appears from the bill that complainants are and have been for many years employes of

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

the Chicago Railways Company and its predecessors, and after becoming such employes, they became members of the defendant organization, Division No. 241 of the Amalgamated Association of Street and Electric Railway Employees of America, of which the defendants are also members; and that complainants having given up the better part of their lives in the employment of the company and its predecessors are, at their ages and condition in life, and because of their long connection with and employment by the company, very uncertain of their ability to obtain and perform other employment than they are engaged in, in the event of losing their present positions with the company.

It further appears that for reasons set out in the bill the complainants concluded that their membership in the defendant organization had ceased to be a benefit to them, and that they resigned as members of Division No. 241, on February 1, 1908, and ceased from that date to be members. And that thereupon, because of complainants' resignations, the officers and members of the executive board of the Division, together with their committees, agents, servants and certain other members of the Division, planned, plotted and conspired to cause the dismissal and discharge of complainants by their employer; and in pursuance of such conspiracy and plan did the acts and made the threats set out in the bill, in execution and promotion thereof. The bill then prays that the defendants and their agents be restrained from plotting, planning and conspiring to wrongfully and unlawfully do any act or in any manner whatsoever attempt to coerce or intimidate the Chicago Railways Company for the purpose of procuring, bringing about or causing the discharge or dismissal of complainants as employes of that company, because of the fact of the resignations of complainants from Division 241, or for any other unlawful and wrongful reason.

It seems to us clear that the question presented by

358 APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

the bill is the old and familiar one that it is a violation of legal right to interfere with business relations recognized by law where there is no sufficient justification for the interference. In other words, the bill is bottomed on the legal proposition that the defendants acted unlawfully in planning and conspiring and doing the overt acts and making the threat alleged in the bill to induce or coerce the Chicago Railways Company to discharge the complainants for the reason that they had resigned from the union, and would not again become members of it, and with the ultimate purpose of forcing the complainants to withdraw their resignations, or rejoin the union, in the interest of a "closed shop" condition on the railways company's system.

We think the legal principles applicable to the facts alleged in the bill are clear and are well settled by numerous adjudications in nearly all the state courts, and in the federal courts as well. These principles are not a matter of first impression, or of study and reasoning by this court. They are laid down in the adjudications of many courts in England and in this country. These decisions when applicable are persuasive with us as authorities, and we are not disposed to disregard them or refuse to follow them, except for the gravest reasons, or because they may be in conflict with the statutes of this state or the decisions of our Supreme Court. They speak the law, and we follow and obey it.

It is well perhaps at the beginning of the discussion to refer to the fundamental principles of the law which support and guarantees the rights and freedom of the laborer or employer in disposing of his own labor or his own capital according to his own will, and break down and destroy all obstructions thereto, whether attempted by labor unions or combinations of capitalists.

In the well known work of Chief Justice Erle on Trade Unions, the learned author says at page 5:

"Every person has a right under the law as between

him and his fellow-subjects, to full freedom in disposing of his own labor or his own capital according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another in the exercise of the right comprised within this description—done, not in the exercise of the actor's own right, but for the purpose of obstruction—would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition; and the violation of this prohibition by a single person is a wrong, to be remedied either by action or by indictment, as the case may be. It is equally a wrong whether it be done by one or many—subject to this observation, that a combination of many to do . a wrong in a matter where the public has an interest, is a substantial offense of conspiracy.    *    *    *    As to combination, each person has a right to choose whether he will labor or not, and also to choose the terms on which he will consent to labor, if labor be his choice. The power of choice in respect to labor and terms, which one person may exercise and declare singly, many after consultation may exercise jointly, and they may make a simultaneous declaration of their choice, and may lawfully act thereon for the immediate purpose of obtaining the required terms; but they cannot create any mutual obligation, having the legal effect of binding each other not to work or not to employ, unless upon terms allowed by the combination. Any arrangement for that purpose, whatever may be its purpose or form, does not bind as an agreement, but is illegal, though not unlawful on account of restraint of trade, and therefore void. Every party to it, who chooses to put an end to it, is thenceforward as free to claim his own terms for his own labor as if such arrangement had never been made; and any attempt to enforce by unlawful coercion, performance

360    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

of any such supposed agreement, against a party who chooses to break from it and labor or contract for labor, upon different terms, is an attempt to obstruct him in the lawful exercise of his right to freedom of trade; and thus a private wrong. It is also a violation of a duty towards the public—that is to say, of the duty to abstain from obstructing the exercise of the right to the free course of trade. A person can neither alienate for a time his freedom to dispose of his own labor or his own capital according to his own will (see Helton v. Eckersly, 6 Ell. & Bl., 47), nor alienate such freedom generally and make himself a slave (see the argument of Hargrave in the Negro Commersetts case, 20 State Trials, 23); it follows that he cannot transfer it to the governing body of a union.''

And in this connection we pause to say in passing that under the above authorities and others which we shall cite, the action of the complainants, in resigning their memberships in, and withdrawing from, the defendant union was strictly within their legal rights, and they stand before a court of equity clothed with all the legal and equitable rights which they would have possessed had they never been members of the defendant union. This conclusion is logical and inevitable, and it eliminates from the case all consideration of their former membership in the union, as beside the case and irrelevant thereto, so far as it may be supposed to affect the rights of the parties. For the same reason we may eliminate from the case as immaterial and irrelevant to the rights of the parties, the willingness of the defendants to receive the complainants back into the union which may be fairly inferable from the allegations of the bill.

As said in the carefully considered case of Willcutt & Sons Co. v. Driscoll, 200 Mass. 110, at page 118 of the opinion:

''In the jurisprudence of any civilized country there are but few, if any, absolute rights—rights which bend to nothing and to which everything else must

bend.   The right to one's life would seem to be quite absolute, but it must yield to the private right of self-defense, and to the public right to punish for crime. And so in the case before us, neither the right of the plaintiff to a free labor market nor the right of the union to impose a fine upon its members is absolute. Neither is to be considered apart from the other, or without reference to any other conflicting right, whether public or private; but each must be regarded as having in the rules of human conduct its own place beyond the limits of which it must not go.   Moreover it must be borne in mind (what sometimes seems to be forgotten by the actors upon each side of such controversies) that the controversy is not a warfare in the sense that for the time being the usual rules of conduct are changed, as in the case of an actual war between two countries.   There is no martial law in these cases, no change in the ordinary rules of society, but these rules remain the same as before, commanding what was theretofore right and prohibiting what was theretofore wrong.''

In the above case a bill in equity was filed by the Willcutt & Sons Co., a corporation, engaged in the business of constructing buildings, against certain persons as officers and members of a union to enjoin the defendants from combining and conspiring by threats or intimidation to prevent any person or persons from entering the employ of the complainant or remaining therein, and particularly by the imposition of fines and penalties upon members of those unions who desired to work for complainant.   The court ordered the injunction.

One of the leading authorities on the questions here involved in this state and in the United States is the case of Doremus v. Hennessy, 176 Ill. 608.   The fundamental principles underlying the questions presented in the bill are there stated.   The plaintiff in that case instituted an action for damages against Doremus and others for conspiring to injure her in her business and

362        APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

to destroy her business because she would not increase
the prices charged by her to her customers in accord-
ance with the scale of prices fixed by an organization
known as the Chicago Laundrymen's Association, and
to that end wilfully and unlawfully, by intimidation and
unlawful inducements, caused parties who were doing
her work to refuse longer to do the same. It will be
observed that the case involved a controversy between
employers, or business proprietors, and the same prin-
ciples of law are binding upon them and enforced
against them as are enforced against employes or la-
borers. At page 614 of the opinion the court say:

"The common law seeks to protect every person
against the wrongful acts of others, whether com-
mitted alone or by combination, and an action may be
had for injuries done which cause another loss in the
enjoyment of any right or privilege or property. No
persons, individually or by combination, have the right
to directly or indirectly interfere or disturb another
in his lawful business or occupation, or to threaten
to do so, for the sake of compelling him to do some
act which, in his judgment, his own interest does not
require. Losses wilfully caused by another from mo-
tives of malice to one who seeks to exercise and en-
joy the fruits and advantages of his own enterprise,
industry, skill and credit, will sustain an action. It is
clear that it is unlawful and actionable for one man
from unlawful motives to interfere with another's
trade by fraud or misrepresentations, or by molesting
his customers or those who would be customers, or by
preventing others from working for him, or causing
them to leave his employ by fraud or misrepresenta-
tion, or physical or moral intimidation, or persuasion,
with an intent to inflict an injury which causes loss.
*   *   *   A combination by them to induce others not
to deal with appellee, or enter into contracts with her,
or do any further work for her, was an actionable
wrong.

"Every man has a right, under the law, as between

himself and others, to full freedom in disposing of his own labor or capital, according to his own will, and any one who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong.''

In O'Brien v. The People, 216 Ill. 354, was involved an attempt to coerce the Kellogg Switchboard & Supply Co. into signing an agreement with a union to which many of its employes belonged while others did not. The proposed agreement among other things provided for a ''closed shop'' and for stewards for each craft, and restricting the number of apprentices to be allowed in the establishment, and that they should all belong to the union. The case was before the court on a writ of error to reverse orders of the lower court finding certain parties guilty of violating an injunction obtained by the Kellogg Co. and imposing punishments therefor. The court said: ''Under the foregoing authorities there can be no doubt that any attempt to coerce the Kellogg Switchboard & Supply Company into signing said agreement by threats to order a strike was unlawful. It was violative of the clear right of the company, and was unjust and oppressive as to those who did not belong to the labor organizations.'' And, quoting from Mathews v. People, 202 Ill. 389: ''It is now well settled that the privilege of contract is both a liberty and a property right. Liberty includes the right to make and enforce contracts, because the right to make and enforce contracts is included in the right to acquire property. Labor is property. To deprive the laborer and the employer of this right to contract with one another is to violate section 2 of article 2 of the Constitution of Illinois, which provides that 'no person shall be deprived of life, liberty or property without due process of law.' It is equally a violation of the fifth and fourteenth amendments of the constitution of the United States,

364    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

which provide that no person shall be deprived of life, liberty or property without due process of law, and that no State shall deprive any person of life, liberty or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

In London Guarantee Co. v. Horn, 206 Ill. 493, the action was brought by Horn against the Guarantee Co. for damages for wrongfully procuring the discharge of the plaintiff by his employers, Arnold Schwinn & Co. Horn was foreman in their factory and had been injured while attempting to operate one of their milling machines. The Guarantee Co. had issued to Arnold Schwinn & Co. an accident policy indemnifying the firm against loss from injuries to employes to the extent of $5000 in case of injury to one person, and not exceeding $10,000 for injuries to two or more persons from the same accident. Offers of $50 and then of $75 were made to Horn by the Guarantee Co. in settlement of his claim for damages, with the statement that if he did not accept, the Guarantee Co. would see to it that Horn was not re-employed by Arnold Schwinn & Co. Horn refused to settle and brought suit against Arnold Schwinn & Co. and recovered a judgment for $3,500 from which an appeal was taken. Pending the appeal an agent of the Guarantee Co. called at the factory of Arnold Schwinn & Co., where Horn had been re-employed, and offered Horn $100 in settlement of his claim and told him that unless he accepted that amount he would have him, Horn, discharged by his employers. Horn still refused to settle on the terms proposed, and the agent, by threatening to cancel the policy of the Guarantee Co. if Horn was not discharged, caused his discharge. As in the case at bar, Horn's employment was not for any particular time, but Arnold Schwinn & Co. did not desire to discharge him.

The court in holding that Horn had a cause of action against the guarantee company for wrongfully

causing his discharge from employment, after discriminating the case of Allen v. Flood, (1898) A. C., 1, relied on by defendant's solicitor and other cases, say:

"Malice, in its legal sense, means a wrongful act done intentionally, without just cause or excuse; the willful violation of a known right. (19 Am. & Eng. Ency. of Law, 2nd ed., p. 623.) Were the acts of appellant wrongful?" The court then quotes from the opinion in Moran v. Dunphy, 177 Mass. 485, as follows: "We apprehend that there no longer is any difficulty in recognizing that a right to be protected from malicious interference may be incident to a right arising out of a contract, although a contract, so far as performance is concerned, imposes a duty only. on the promisor. Again, in the case of a contract of employment, even where the employment is at will, the fact that the employer is free from liability for discharging the plaintiff does not carry with it immunity to the defendant, who has controlled the employer's action to the plaintiff's harm."

The court also quotes from Bowen v. Hall, 6 Q. B. D. 333 as follows:

"If the persuasion be used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and, therefore, an actionable act if injury ensues from it."

After citing and quoting from Perkins v. Pendleton, 90 Me. 166, and Chipley v. Atkinson, 23 Fla. 206, which hold, "that whenever a person, by means of fraud or intimidation, procures either the breach of a contract or the discharge of a plaintiff from an employment, which, but for such wrongful interference, would have continued, he is liable in damages for such injuries as naturally result therefrom; and that the rule is the same whether by these wrongful means a contract of employment definite as to time is broken, or an employer is induced, solely by reason of such procure-

ment, to discharge an employee whom he would otherwise have retained," the court says: "This question has frequently been before courts of last resort in this country. The view taken in the two cases last cited finds support in the following authorities: Moran v. Dunphy, *supra;* Curran v. Galen, 152 N. Y. 33; Raycroft v. Tayntor, *supra;* Lucke v. Clothing Cutters, 77 Md. 396; Hollenbeck v. Ristine, *supra,* and also in Blumenthal v. Shaw, 77 Fed. Rep. 954, decided by the Third Circuit Court of Appeals."

In Illinois Steel Company v. Brenshall, 141 Ill. App. 36, there was included in the plaintiff's claim damages for wrongfully and maliciously procuring the discharge of the plaintiff from the Chicago, Lake Shore & Eastern Railroad Company, and for preventing him from getting similar employment elsewhere in South Chicago. For this the jury awarded the plaintiff $517.50 and judgment was rendered on the verdict.

It appeared in the case that there was a rule or regulation between the Illinois Steel Company and the Chicago, Lake Shore & Eastern Railway Company to the effect that a man injured while working for one company is not knowingly allowed to work for either company within the plant of the Illinois Steel Company, until he has settled with the company against which he has a claim for such injuries. Plaintiff was injured while in the employ of the Illinois Steel Company, and refused to settle on terms proposed by that company, and for that reason was discharged from the employ of the C., L. S. & E. Railway Co. at the instance of the defendant. This court in affirming the judgment said, Mr. Justice Adams speaking for the court: "The rule in question is the expression of a combination and agreement between the two companies to force a settlement and the execution of a release by any one injured in the employ of either company, by presenting to him the alternative of discharge by the company in whose employ he was injured, and the refusal of the other company to employ him, or if, by inadvertence,

it employs him, his discharge by that company. The rule is unconscionable, unjust, tyrannical and unlawful and cannot be too severely condemned.'' The court cites Fidelity & Casualty Co. of N. Y. v. Gibson, 135 Ill. App. 290, which is based in part upon London Guarantee Co. v. Horn, *supra,* and quotes from the opinion in that case as follows: ''We therefore conclude both upon reason and authority, that where a third party induces an employer to discharge his employee, who was working under a contract terminable at will, but under which the employment would be continued indefinitely, in accordance with the desire of the employer, except for such interference and where the only motive moving the third party is the desire to injure the employee and to benefit himself at the expense of the employee, by compelling the latter to surrender an alleged cause of action, for the satisfaction of which, in whole or in part, such third party is liable, and where such cause of action does not depend upon and is not connected with the continuance of such employment, a cause of action arises in favor of the employee against the third party.''

Perkins v. Pendleton, 90 Me. 167, was an action on the case for wrongfully causing the plaintiff to be discharged while an employe of the Mount Waldo Granite Company. The action was against members of the Mount Waldo Branch of the Granite Cutters National Union. The declaration averred that the defendants by inducements, threats, etc., procured the plaintiff's discharge for the sole reason that plaintiff would not become a member of the union.

The defendants demurred to the declaration and the demurrer was overruled, and the case was before the court on that ruling. The Supreme Court held after reviewing a long line of authorities, some of which are cited in this opinion, that the declaration set out a good cause of action, saying: ''Our conclusion is, that wherever a person, by means of fraud or intimidation,

procures, either the breach of a contract or the discharge of a plaintiff, from an employment, which but for such wrongful interference would have continued, he is liable in damages for such injuries as naturally result therefrom; and that the rule is the same whether by these wrongful means a contract of employment definite as to time is broken, or an employer is induced, solely by reason of such procurement, to discharge an employee whom he would otherwise have retained. * *

"To intimidate an employer, by threats, if the threats are of such a character as to produce this result and thereby cause him to discharge an employee, whom he desired to retain and would have retained, except for such unlawful threats, is an actionable wrong."

In Beck v. Railway Teamsters, 118 Mich. 497, a demand had been made by the teamsters union on the Beck Company to sign an agreement to employ only union men, etc. The demand was refused. The union then organized a strike to enforce the demand. An injunction was obtained. In reviewing it the Supreme Court of Michigan *inter alia* said:

"The law protects them (complainants) in their right to employ whom they please, at prices they and their employees can agree upon, and to discharge them at the expiration of their term of service or for violation of their contracts. This right must be maintained or personal liberty is a sham. So, also, the laborers have the right to fix a price upon their labor, and to refuse to work unless that price is obtained. * * * The law is the same for both, and is alike open to both. * * * The course pursued by these defendants, if unchecked, would soon ruin the complainant's business, and bring upon them financial ruin. The defendants and their associates well knew this, and undoubtedly hoped to force complainants to abdicate their legal rights, and to permit defendants to dictate whom complainants should employ, the price they

should pay, and the reasons for discharging their employes.''

In Purington v. Hinchliff, 219 Ill. 159, there was before the court an action for damages by a brick manufacturer against certain other brick manufacturers and a bricklayers union, between whom an agreement had been made not to use, purchase, or lay brick made by any person who had not subscribed to the rules for the builders association. The plaintiff recovered judgment and on appeal the Supreme Court, in affirming the judgment, said: ''The question of unlawful conspiracy to injure the business of another, and the necessary elements to constitute it, has been before this court on other occasions. Our Reports contain many well considered cases on the subject. No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss wilfully caused by such interference will give the party injured a right of action for all damages sustained. All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done, pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not. (Doremus v. Hennessy, 176 Ill. 608; O'Brien v. People ex rel., 216 *id.* 354.) To the same effect see Smith v. People, 25 Ill. 9; Craft v. McConoughy, 79 *id.* 346; Moore v. Bennett, 140 *id.* 69; Foss v. Cummings, 149 *id.* 353; American Live Stock Commission Co. v. Live Stock Exchange, 143 *id.* 210; Harding v. American Glucose Co., 182 *id.* 551; Lasher v. Littell, 202 *id.* 551: Chicago, Wilmington & Vermilion Coal Co. v. People, 214 *id.* 421. To the same effect are the decisions of courts in other jurisdictions. See cases cited in Doremus v. Hennessy, *supra,* on page 616.''

In Erdman v. Mitchell, 207 Pa. State 79, the complainants were members of a plumbers union which had refused to affiliate with the Allied Building

370    Appellate Courts of Illinois.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

Trades of Philadelphia. Complainants were at work on a certain building, and the union men working on the building who were affiliated with the Allied Trades, defendants, were ordered to strike and remain out until the general contractors required the complainants to desist from working at the building. An injunction was granted restraining the defendants from combining, conspiring or attempting to interfere with the employment of the complainants or any one or more of them etc.

The Supreme Court of Pennsylvania in sustaining the injunction said: "This evidence would have established a conspiracy at common law. * * * The right to the free use of his hands is the workman's property, as much as the rich man's right to the undisturbed income from his factory, houses and lands. By his work he earns present subsistence for himself and family. His savings may result in accumulations which will make him as rich in houses and lands as his employer. This right of acquiring property, is an inherent, indefeasible right of the workman. To exercise it he must have the unrestricted privilege of working for such employer as he chooses, at such wages as he chooses to accept. This is one of the rights guaranteed him by our Declaration of Rights. It is a right of which the Legislature cannot deprive him, one which the law of no trades union can take from him, and one which it is the bounden duty of the courts to protect. The one most concerned in jealousy maintaining this freedom is the workman himself. * * * Trades unions may cease to work, for reasons satisfactory to their members; but if they combine to prevent others from obtaining work by threats of a strike, or combine to prevent an employer from employing others by threats of a strike, they combine to accomplish an unlawful purpose—a purpose as unlawful now as it ever was, * * * Such combination is a despotic and tyrannical violation of the indefeasible right of labor to acquire property, which courts

are bound to restrain. It is utterly subversive of the letter and spirit of the Declaration of Rights. If such combination be in accord with the law of trade unions, then that law and the organic law of the people of a free commonwealth cannot stand together. One or the other must go down."

Many more authorities might be cited to sustain the doctrines announced in the above cases, but we think it unnecessary. The principles stated and their application to cases like the case at bar are held and applied in the following cases, which are frequently cited, and many others: Adams v. Brenan, 177 Ill. 194; Frorer v. People, 141 Ill. 171; Curran v. Galen, 152 N. Y. 33; Ritchie v. People, 155 Ill. 98; Berry v. Donovan, 188 Mass. 353; Crump v. Commonwealth, 84 Va. 927; Sailors Union v. Hammond Lumber Co., 156 Fed. Rep. 450; Carew v. Rutherford, 106 Mass. 1; Barnes v. Berry, 156 Fed. Rep. 72; Jensen v. Cooks & Waiters Union, 81 Pacific Rep. 1069; Martell v. White, 185 Mass. 255; Lucke v. Clothing Cutters, 77 Md. 396; Blumenthal v. Shaw, 77 Fed. Rep. 954; Aikens v. Wisconsin, 195 U. S. 194; Plant v. Woods, 176 Mass. 492.

On behalf of the defendants the case of Allen v. Flood, (1898) A. C. 1, is cited and relied upon. That case is not followed or recognized as authority in this jurisdiction. Wilson v. Hey, *supra;* London Guarantee Co. v. Horn, *supra.* It is distinguished in the additional opinion filed in the Doremus case, *supra;* and the Supreme Court of Wisconsin in State v. Huegin, 110 Wis. 189, says at page 257: "The decision in Allen v. Flood was not reached by any great weight in number. Lord Watson, who delivered the main opinion in favor of it, confessed that the rule established was new in English law.  *  *  *  Lord Morris said that the decision overturned 'the overwhelming judicial opinion of England.' In that situation one can discover very little in the case to warrant adopting it and extending the principle thereof to a combination to maliciously injure."

372    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

Counsel for defendants also cite National Prot. Ass'n. of Steam Fitters, etc. v. Cumming, 170 N. Y. 315. The majority opinion in that case has been criticised by law writers and courts generally. The propositions and arguments of the opinion have not been approved or followed in any well-considered case to our knowledge. If, however, the opinion be read in the manner suggested by Professor Jeremiah Smith in his article on Crucial Issues in Labor Litigation in Harvard Law Review, Vol. 20, p. 254, where, in speaking of conflicting opinions generally he says: "If we look 'to what has been actually decided' in many cases rather than 'to what has been *said*,'" it will be found, we think, that less was decided in the opinion than would ordinarily be supposed from what is there said. After a long discussion of the law, a consideration of the facts found by the trial judge is entered upon. After transposing the findings to what he deems a more logical order, the writer of the opinion concludes his discussion of the facts as follows: "Having finished the discussion of the facts, I reiterate that, within the rules of law I have quoted, it must appear, in order to make out a cause of action against these defendants, that in what they did they were actuated by improper motives—by a malicious desire to injure the plaintiffs. There is no such finding of fact, and there is no right in this court to infer it if it would, and, from the other facts found, it is plain that it should not if it could." Accordingly he affirms the Supreme Court in its reversal of a judgment entered by the trial court against the defendant union and its members on the ground that the facts found did not support the judgment.

Upon this conclusion of fact, a judgment for the defendants would seem to us a very simple and natural conclusion. The case really turned on a finding of fact, and that fact being established, the result reached

would be acquiesced in by all courts. The finding of fact was, however, the reverse of the admitted facts averred in the bill in this case.

It will be seen from the foregoing authorities that the law has the same mandate for the rich and the poor, for the corporations and the individuals, for the manufacturer and the laborer and the labor union. It is no respecter of persons. Ours is a government by law, not by men. The freedom and dignity of labor lies at the very foundation of our institutions. The right to labor existed before governments were formed. Hence, the jealous and scrupulous care manifested in all the judgments of courts to guard and protect the freedom and inalienable right of the individual to labor. It is often all the property he has. His right to it and to dispose of it when and where he pleases is guaranteed to him by the fundamental law of our government.

The cases of Willcutt & Sons Co. v. Driscoll, *supra,* and Beck v. Railway Teamsters, *supra,* are the counterparts and complements of the case at bar. In those cases the employers filed bills to enjoin the unions and the members from threatening and coercing their employes to leave their work and to throw up their employment with the complainant in each case. In this case the employes file their bill to enjoin and restrain the union and its members from threatening and coercing the employer to discharge complainants. The bill in this case and the right to relief is founded on the same principles of law. Why should the law protect the employer and not afford like protection to the employe? The answer is that it protects both. It is not inconsistent, or illogical or unjust. It affords the same protection and the same remedies to the laborer as it does to the employer. This is shown by London Guarantee Co. v. Horn, *supra,* Illinois Steel Co. v. Brenshall, *supra,* Perkins v. Pendleton, *supra,* Erdman v. Mitchell, *supra,* and other cases cited. As

we have said elsewhere, the law applies the same rule to all men under the same circumstances.

According to the allegations of the bill the primary and direct object and purpose of the conspiracy and acts of the defendants in execution thereof was to compel the Chicago Railways Company to discharge complainants from its employ. This brings the case fully within the authorities above cited. To secure the discharge of the complainants without good cause or any cause would be malicious torts against them, for which under the authorities they would have rights of action against the defendants.

If, as it is argued, the purpose and object of the conspiracy and threats was to compel the complainants' discharge only in the event that they refused to withdraw their resignations and again join the union, it was an effort to coerce them to do what in their judgment their own interests did not require, and was equally unlawful and wrongful. Doremus v. Hennessy, *supra;* London Guarantee Co. v. Horn, *supra.*

If it can be claimed under the averments of the bill that the discharge of complainants was not the direct and proximate purpose and object to be attained by the defendants, but the purpose was to compel and coerce the complainants to become members of the union against their wishes in order to establish or maintain a "closed shop" condition on the lines or system of the Chicago Railways Company, the purpose was likewise illegal and wrongful. O'Brien v. People, *supra;* Doremus v. Hennessy, *supra,* and cases there cited; Barnes & Co. v. Berry, *supra;* Franklin Union v. People, *supra.*

The acts complained of cannot be justified for any of these purposes. Nor can they be justified on the plea of trade competition. No such question is raised by the averments of the bill. The defendant union cannot of itself do any work, and therefore cannot be in competition with the complainants or any of them for their places, unless it might be for some of its idle

members. The individual members of the union who were threatening to strike, or who were to be ordered to strike by the union, could not be considered as competitors, as they were already employed, and could not as a physical possibility fill their own positions with the company and, at the same time, the positions which would be made vacant by the discharge of complainants. The acts and measures against which relief is sought by the bill were not mere competition in business. They were an effort to drive complainants from their positions, not by underbidding them, not by doing the same work better or more cheaply, nor by refusing to work with them for good and sufficient causes, but were malicious interference and intimidation exerted on their employer for the purpose of inflicting injury and causing loss to complainants.

In Barnes v. Typographical Union, 232 Ill. 424, which was a bill for injunction where a demurrer had been overruled, and a decree entered according to the prayer of the bill, the court say, at page 431: "Again, in the case of London Guarantee & Accident Co. v. Horn, 206 Ill. 493, the court rejected fanciful and far-fetched definitions of the word 'competition' which would include all conflicts of temporal interests, and gave to the word its ordinary meaning and signification. In that case there was a conflict of interest between Horn and the Guarantee Company equal to that which existed here between complainants and defendants, and there was a like attempt of the guarantee company to derive a benefit by procuring Horn's discharge. This is not the case of one laborer seeking to obtain the place of another by offering better services or better terms, which would be competition, nor the case of an employer hiring one laborer away from another because he desires the services of such laborer, but there were offers to pay money and transportation and to maintain laborers in idleness, for which defendants would receive nothing and injury would be inflicted on the complain-

ants. Under the meaning given to the word 'competition' in the case last referred to, the complainants and defendants were not in competition in any sense and there could be no justification of defendants' acts on that ground. The whole scheme as set out in the bill was to injure the complainants for the purpose of compelling them to yield to the union their absolute legal right to manage their own business in their own way.''

The above case sustains the general principles announced in the cases cited above and the views herein expressed. It is directly in point in this case.

Nor do we think the acts complained of can be justified on the plea that they were done for the good of the union or its members as suggested above. ''The benefit to the members of the combination is so remote, as compared to the direct and immediate injury inflicted upon the non-union workmen, that the law does not look beyond the immediate loss and damage to the innocent parties to the remote benefits that might result to the unions.'' Eddy on Combinations, page 416; Erdman v. Mitchell, *supra.*

What we have said above, and the authorities cited, dispose of the contention of counsel for defendants that the defendants had a right to strike or threaten to strike for the purpose alleged in the bill. In other words, had they a right to strike for the purpose of compeling, inducing or coercing the Chicago Railways Company to discharge the complainants as employes of that company because they had resigned from the union and refused to join it again, and with the ultimate purpose of establishing a ''closed shop'' condition on the company's system? Or, to put the question in a different form, is a labor union and its members acting as an organized body of men, it being conceded that the organization was brought about by the exercise on the part of its members of the right of every citizen to pursue his calling as he thinks best, limited in what it can do by the existence of the same right in each and every other citizen to pursue his and their

calling as he or they think best? To answer the last form of the question first, in our opinion the union and its members are limited by the existence of the same right in each and every other citizen. And to answer the question first put, we think the defendants did not have a right to strike for the purposes alleged in the bill or either or any of them.

In support of this position we refer again to what we have already said and to the authorities cited above, and to what Sir William Erle says at page 12 of his book on Trades Unions, quoted above, and cited by the Massachusetts Supreme Judicial Court in Plant v. Woods, 176 Mass. 492, and Pickett v. Walsh, 192 Mass. 572. In the last mentioned case, which arose on a bill by laborers against two unions, will be found a very clear and logical discussion of this question and the essential elements which enter into it, and giving an additional reason against the right to strike under the facts set forth in the bill. The conclusion of the court is thus expressed: ''In our opinion organized labor's right of coercion and compulsion is limited to strikes on persons with whom the organization has a trade dispute; or, to put it in another way, we are of opinion that a strike on A. with whom the striker has no trade dispute, to compel A. to force B. to yield to the striker's demands, is an unjustifiable interference with the right of A. to pursue his calling as he thinks best. Only two cases to the contrary have come to our attention, namely: Bohn Mfg. Co. v. Hollis, 54 Minn. 233, and Marx & H. Jeans Clothing Co. v. Watson, 168 Mo. 133. The first of these two cases was overruled on this point in Gray v. Building Trades Council, 91 Minn. 171. The conclusion to which we have come is supported by My Maryland Lodge No. 186 of Machinists v. Adt, 100 Md. 238; Gray v. Building Trades Council, *supra;* Purington v. Hinchliff, 219 Ill. 159; Beck v. Railway Teamsters Protective Union, 118 Mich. 497; Crump v. Com, 84 Va. 927; State v. Glidden,

378    APPELLATE COURTS OF ILLINOIS.

Kemp v. D. No. 241 of A. A. of S. & E. Ry. E. of A., 153 Ill. App. 344.

55 Conn. 46; Purvis v. Local No. 500 M. B. of C. & J. 214 Pa. 348; Gatzow v. Buening, 106 Wis. 1; Barr v. Essex Trades Council, 53 N. J. Eq. 101; Temperton v. Russell, (1893) 1 Q. B. 715; Taft, J., in Toledo A. A. & N. M. R. Co. v. Pennsylvania Co., 19 L. R. A. 387; Loewe v. California State Federation of Labor, 139 Fed. 71; Hopkins v. Oxley Stave Co., 28 C. C. A. 99; 49 U. S. App. 709, 83 Fed. 912; Casey v. Cincinnati Typographical Union No. 3, 12 L. R. A. 193, 45 Fed. 135.''

We have before us upon the allegations of the bill, admitted to be true by the demurrer of the defendants, a case where there is no trade dispute involved between the defendants and their employer, the Chicago Railways Company, against which the defendants voted to strike. The dispute or controversy, as we have above stated, was and is between complainants and defendants, who are fellow workmen. When the trade dispute or controversy is between the employer and employes alone, with reference to wages, methods, hours of labor or surroundings in their particular employment, as in the case of Franklin Union No. 4, the right to strike is conceded. This right is found in and arises from the right of one or more citizens to pursue his or their calling as he or they see fit, where no contract is involved, and where the like rights of third persons are not involved or affected.

Every one has a right to enjoy the fruits and advantages of his own industry, enterprise, skill and credit, broadly speaking. The very fact of its universality, however, implies exceptions and limitations as, for instance, this right yields to competition. He has no right to be protected against competition. If loss results to him merely through competition of others, or their exercise of like rights, it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with.

Another limitation is, that upon every one is imposed a correlative duty—too often forgotten by the

trades unionists and employers alike—not to interfere unjustifiably with the exercise by others of the same right.

It follows, we think, that where there is a trade dispute between employer and employes, and a strike is resorted to for the purpose of securing an adjustment, with the incidental result that the establishment is closed and third parties are thrown out of employment and loss ensues to them, they are without remedy. But, if no trade dispute exists between employer and employes, and the controversy, as in the case at bar, is between the employes over a matter not connected with their employment—the resignation of complainants from the union—and a strike is inaugurated against the employer to compel or coerce him to discharge an employe unless such employe will become a member of the union, or to force the employe against his will to join the union, such strike is without right and illegal and the rights of such employe are unlawfully interfered with, and he has a right of action for all losses directly resulting from such action. An employe has an absolute right to refuse to belong to the union, and no one under any circumstances has a right to compel him to join it. It is therefore a legal and actionable wrong to him to obstruct or interfere with him in. the exercise of such right in the manner and for the purpose set forth in the bill. This position is sustained by the cases cited and the great weight of authority.

In Chipley v. Atkinson, 23 Fla. 206, quoted with approval in London Guarantee Co. v. Horn, *supra,* it is said: "It is the legal right of the party to such agreement (of indefinite employment) to terminate it or refuse to perform it, and in doing so he violates no right of the other party to it, but so long as the former is willing and ready to perform, it is not the legal right, but is a wrong on the part of a third party to

maliciously and wantonly procure the former to terminate or refuse to perform it.''

The Supreme Court of the United States, Justice Holmes delivering the opinion—the same justice who wrote the dissenting opinion in Plant v. Wood, *supra,* —in Aikens v. Wisconsin, 195 U. S. 194 says, at page 205: ''But if all these general considerations be admitted, it is urged nevertheless that the means intended to be used by this particular combination were simply the abstinence from making contracts, that a man's right so to abstain cannot be infringed on the ground of motives, and further, that it carries with it the right to communicate that intent to abstain to others and to abstain in common with them. It is said that if the statute extends to such a case it must be unconstitutional. The fallacy of this argument lies in the assumption that the statute stands no better than if directed against pure nonfeasance of singly omitting to contract. The statute is directly against a series of acts, and acts of several, the acts of combining, with intent to do other acts. 'The very plot is an act itself.' Mulcahy v. The Queen L. R. 3, H. L. 306, 317. But an act, which in itself is merely a voluntary muscular contraction, derives all its character from the consequences which will follow it under the circumstances in which it was done. When the act consists of making a combination calculated to cause temporal damage, the power to punish acts, when done maliciously, cannot be denied because they are to be followed and worked out by conduct which might have been lawful if not preceded by the acts. No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and if it is a step in a plot neither its innocence nor the constitution is sufficient to prevent the punishment of the plot by law.''

In Reynolds v. Davis, 84 N. E. 457, the Supreme

Judicial Court of Massachusetts say: "It is settled in this commonwealth that the legality of a combination not to work for an employer, that is to say, of a strike, depends (in case the strikers are not under contract to work for him) upon the purpose for which the employes strike."

In Toledo A. A. & N. M. Ry. Co. v. Penna. Co., 54 Fed. Rep. 730, Judge Taft says in his opinion: "What the employes threaten to do is to deprive the defendant companies of the benefit thus accruing from their labor, in order to induce, procure and compel the companies and their managing officers to consent to do a criminal and unlawful injury to the complainants. Neither law nor morals can give a man the right to labor or withhold his labor for such a purpose."

And in Thomas v. Cincinnati N. O. & T. P. Ry. Co., 62 Fed. Rep. 803, 818, the same judge says: "All the employes had the right to quit their employment, but they had no right to combine to quit in order thereby to compel their employer to withdraw from a mutually profitable relation with a third person for the purpose of injuring that third person, when the relation thus sought to be broken had no effect whatever on the character or reward of their service. It is the motive for quitting and the end sought thereby that makes the injury inflicted unlawful and the combination by which it is effected an unlawful conspiracy."

This, we think, is the general trend and consensus of judicial opinion in England and in this country upon the questions presented by the facts alleged in the amended and supplemental bill. It is the law of this State. There are a few cases, some of which we have noticed, which hold to different views, but they do not express the law of Illinois.

No question is raised as to the jurisdiction of a court of equity to entertain the bill in the brief or argument of counsel for defendants. "It is conceded," the court says in Beck v. Railway Teamsters, *supra*, "that courts of equity have jurisdiction to restrain con-

spiracies of this character when irreparable injury is sure to follow. Suits at law would be inadequate, and a multiplicity of suits at law would arise.'' To the same effect are, In re Debs, 158 U. S. 564; Nat. Prot. Assn. v. Cummings, *supra*, dissenting opinion of Judge Vann; Davis v. Zimmerman, 91 Hun 489, and the authorities above cited.

In the opinion of the court the chancellor erred in sustaining the demurrer to the amended and supplemental bill and dismissing the bill for want of equity. The decree is therefore reversed and the cause is remanded with directions to overrule the demurrer to the bill and for further proceedings consistent with this opinion.

*Reversed and remanded with directions.*

MR. JUSTICE MACK dissenting. (See post, p. 637.)